Christopher T. Micheletti (SBN 136446)
Qianwei Fu (SBN 242669)
**ZELLE LLP**
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone: (415) 693-0700
Facsimile: (415) 693-0770
cmicheletti@zellelaw.com
qfu@zellelaw.com

***Counsel for Plaintiffs Robert Ott and***
***Andrew Stanley***

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

ROBERT OTT and ANDREW STANLEY, on
behalf of themselves and all others similarly
situated,

        *Plaintiffs*,

        v.

SYNGENTA CROP PROTECTION AG,
SYNGENTA CORPORATION, SYNGENTA
CROP PROTECTION, LLC, and CORTEVA,
INC.,

        *Defendants*.

Civil Action No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

1

CLASS ACTION COMPLAINT

Plaintiffs Robert Ott and Andrew Stanley bring this action on behalf of themselves and on behalf of the Class defined herein against Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC (collectively, "Syngenta"), and Corteva, Inc. ("Corteva") (together with Syngenta, "Defendants"). Defendants' exclusionary and anticompetitive conduct has caused U.S. farmers such as Plaintiffs and the Class to pay artificially inflated prices for certain crop protection products needed to protect their crops from pests. Plaintiffs bring this action against Defendants for injunctive relief under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and Section 3 of the Clayton Act, 15 U.S.C. § 14. Plaintiffs also bring this action for damages under state antitrust laws and consumer protection laws. Plaintiffs demand a trial by jury.

## I.     NATURE OF THE ACTION

1. This lawsuit arises out of an anticompetitive scheme by Defendants, two manufacturing giants in the crop protection product industry, to illegally block rivals from the market and insulate themselves from competition. Defendants have entered into exclusionary "loyalty agreements" with substantially all of their major customers that deter those customers from purchasing products from manufacturers other than Defendants. The effect of those exclusionary agreements has been to lock rival manufacturers out of the market and force farmers like Plaintiffs to pay artificially inflated prices for the certain crop protection products that are essential to their business.

2. For many years, U.S. farmers have faced a sharp rise in their operating expenses, with 80% of those surveyed in 2018 indicating that their costs were increasing and they were unable to pay off their debts. In 2023, farm production expenses were projected to be record-high at nearly $500 million.

3. In the latest-revealed scheme aimed at exploiting farmers in the United States, Defendants Syngenta and Corteva have each implemented special "loyalty programs" in connection with key active ingredients that are incorporated into products that farmers use to protect crops from damage caused by insects, weeds, and fungi.

4. Under these loyalty programs, Defendants Syngenta and Corteva provide payments to distributors in exchange for their commitment to sell a specific volume of certain crop protection products manufactured by Defendants, while restricting sales of generic products made by competing manufacturers. Defendants implement and enforce these loyalty programs to ensure that manufacturers of generic products are unable to effectively distribute their products, which preserves Defendants' control of the market and prevents price competition.

5. A recent complaint filed by the Federal Trade Commission (FTC) and ten state Attorneys General has exposed the success of Syngenta and Corteva's scheme. Distributors have been motivated to receive loyalty payments from Defendants by severely limiting or even completely halting the sales of competing crop protection products. Without these distributors, competing manufacturers cannot effectively sell their crop protection products and farmers are forced to purchase Defendants' higher-priced products. As a result, farmers face decreased innovation, fewer choices, and increased prices totaling at least hundreds of millions of dollars in overcharges.

6. Farmers use crop protection products (which include agricultural "pesticides") to control pests that would otherwise harm their crops. These products are crucial to crop management as they enable farmers to grow safe, healthy food and to increase crop quality and yield. Every year, U.S. farmers spend more than ten billion dollars on crop protection products. In FY 2022, Syngenta's worldwide sales were approximately $16.3 billion and Corteva's worldwide sales were approximately $8.5 billion.

7. The crop protection product industry is regulated through a framework similar to that currently governing the pharmaceutical industry. This framework involves patent and safety requirements coupled with certain exclusivity benefits. Under Congress's patent and regulatory scheme, Defendants Syngenta and Corteva are "basic" manufacturers that initially develop, patent, and register the active ingredients that make crop protection products effective. Once approved, these basic manufacturers possess certain exclusive rights for a period of years. Once the exclusivity period ends, generic manufacturers may enter the market with equivalent products

3

containing the same active ingredients and relying upon the same toxicology and environmental impact data. Competition from generic products leads to significant price reductions.

8. The availability of generic crop protection products has resulted in reduced prices for farmers. However, Defendants have each designed and implemented "loyalty programs" to limit competition from generic alternatives long after regulatory and patent exclusivity periods expire.

9. On September 29, 2022, following an investigation, the FTC and ten U.S. states filed a complaint against Syngenta and Corteva alleging that Defendants' loyalty programs severely limit the availability of lower-priced generic products and result in higher prices for farmers in violation of federal and state antitrust laws.

10. As revealed by the FTC's investigation, each of Defendants' loyalty programs provide that Defendants will make payments in the form of "rebates" to distributors based on their purchases of Defendant-branded crop protection products—but there is a condition: distributors and retailers must limit their purchases of generic products to pre-determined percentages. Defendants both reward participation in their loyalty programs and punish non-compliance. Indeed, Defendants ensure that distributors profit more from accepting Defendants' "rebates" payments than they would from distributing a higher volume of lower-priced, generic products.

11. Since they profit from participating in Defendants' loyalty programs and face significant financial consequences if they do not, these distributors readily exclude generic products from their distribution lists. As a result, generic competitors are almost entirely foreclosed from efficiently distributing their products. Prices remain high and farmers pay millions of dollars more than they otherwise would have for crop protection products containing Defendants' ingredients. Defendants, on the other hand, are able to maintain high prices and dominant market positions years after their exclusivity expires. While Defendants and their distributors benefit, farmers are left to pay supracompetitive prices for crop protection products and are deprived of access to cheaper generic alternatives.

12. The loyalty programs benefit both Defendants and distributors. Only a small number of distributors dominate the sale of crop protection products in the United States and each

4

Defendant has entered into loyalty programs with all or substantially all of them. The participation of all or substantially all distributors gives participating distributors increased confidence that no significant competing distributor will partner closely with low-price generic manufacturers to undercut them. Distributors thus benefit from the arrangement so long as their principal competitors participate, so that no distributor can take substantial market share away from other distributors by offering generic alternatives at cheaper prices.

13.     As a result of Defendants' conduct, Defendants have restrained competition, maintained unlawful monopolies, and harmed American farmers, reducing choices for these farmers and costing them at least hundreds of millions of dollars in overcharges. Plaintiffs and the Class bring this antitrust suit under federal antitrust laws, state antitrust, unfair competition, and consumer protections laws, and the laws of unjust enrichment to redress that wrongful conduct.

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Class are citizens of a state different from that of one of Defendants.

15.     This Court also has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2. Plaintiffs request declaratory and equitable relief and seek to recover overcharges and treble damages for injuries sustained by Plaintiffs and the Class resulting from Defendants' anticompetitive agreements and unlawful foreclosure of competition in the Relevant Markets that maintained and enhanced Defendants' dominant position and monopoly power. Given that Plaintiffs seek declaratory and equitable relief for these violations of the Clayton Act and the Sherman Antitrust Act, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a). The Court possesses supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

16.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. § 1391(b), (c), and (d). One or more Defendants resided,

transacted business, are found, had agents in, or engaged in substantial activity in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

17. This Court also has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of crop protection products throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

18. Defendants' activities were carried out within the flow of interstate commerce of the United States and were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

### III. PARTIES

**A. Plaintiffs**

19. Plaintiff Robert Ott is a farmer who owns a farm in California. During the Class Period, Ott purchased one or more Syngenta and/or Corteva crop protection products that contained a Relevant AI described herein.

20. Plaintiff Andrew Stanley is a farmer who has owned farms in Michigan, Idaho and West Virginia. During the Class Period, Stanley purchased one or more Syngenta and/or Corteva crop protection products that contained a Relevant AI described herein.

**B. Defendants**

21. Defendant Syngenta Crop Protection AG is a corporation organized under the laws of Switzerland, with its headquarters in Basel, Switzerland. Since in or about May 2021, Syngenta Crop Protection AG has been an indirect subsidiary of Sinochem Holdings Corporation Ltd., a chemical company based in Beijing, China. Syngenta Crop Protection AG's North American headquarters are located in Greensboro, North Carolina. Syngenta Crop Protection AG transacts

6

or has transacted business in this District, and is engaged in the development, manufacture, and sale of certain crop protection products.

22. Defendant Syngenta Corporation is a privately held subsidiary of Syngenta Crop Protection AG, which markets seeds and crop protection products in the United States and is headquartered in Wilmington, Delaware. Syngenta Corporation is a corporation organized and existing under the laws of the State of Delaware. Syngenta Corporation transacts or has transacted business in this District, and is engaged in the development, manufacture, and sale of certain crop protection products.

23. Defendant Syngenta Crop Protection, LLC is a corporate affiliate of Syngenta Crop Protection AG and is headquartered at 410 S. Swing Road, Greensboro, North Carolina 27409. Syngenta Crop Protection, LLC is a limited liability company organized and existing under the laws of the State of Delaware. Syngenta Crop Protection, LLC transacts or has transacted business in this District, and is engaged in the development, manufacture, and sale of certain crop protection products.

24. Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC are referred to collectively as "Syngenta".

25. Defendant Corteva, Inc. is a publicly held corporation headquartered at 9330 Zionsville Road, Indianapolis, Indiana 46268. Corteva is the successor company to the agriscience businesses of E.I. du Pont de Nemours ("DuPont") and Dow Chemical Company ("Dow"). Corteva is a corporation organized and existing under the laws of the State of Delaware. Substantially all of Corteva's revenue is derived from the sales of seeds and crop protection products to farmers, distributors, and manufacturers. It sold $4.382 billion in crop protection products for the six months ending June 30, 2022. Corteva transacts or has transacted business in this District and is engaged in the development, manufacture, and sale of certain crop protection products.

26. Corteva, Inc. is referred to as "Corteva".

# IV. FACTUAL ALLEGATIONS

## A. Crop-Protection Products

27. Most pesticides sold in the United States are used for crop protection. They can kill or control pests, i.e., diseases, weed, insects, and other organisms. As used herein, and consistently with industry practice, the term "pesticides" refers collectively to insecticides (including nemanticides), herbicides, and fungicides.

28. Pesticides are frequently used by farmers to prevent the harm that pests cause to their crops. The pesticides used for crop protection are referred to herein as "certain crop protection products." Certain crop protection products are essential for farming as their use substantially boosts quality and crop yields for reliable food supply.

29. Crop protection products fall into the following three primary categories: (1) herbicides to target plants or weeds; (2) insecticides (including nematicides) to target insect infestations; and (3) fungicides to target fungal diseases. Though each type of crop protection product has a separate target, all are still referred to generally as pesticides in common vernacular and within this complaint.

30. Every crop protection product includes one or more active ingredients ("AI"). AIs are chemical substances that kill or reduce the targeted pest. A crop protection product contains at least one AI, which is the chemical substance that kills or controls the targeted pest. A finished crop protection product is comprised of an AI and an inert component (water, adjuvants, surfactants, or other active ingredients). Final products with one active ingredient are considered "straight goods" and products with at least two active ingredients are considered "mixtures."

31. AIs may be sold individually in "technical grade" or for "manufacturing use," before being formulated into a completed crop protection product. Additional processing, however, is necessary before they can be used by farmers as final crop protection products.

32. Several criteria serve to distinguish one AI from another. These include: (a) the pest(s) targeted by an AI; (b) the effectiveness of an AI at controlling the targeted pest, which is often measured in terms of crop yield improvements; (c) the crops upon which an active ingredient is suited and registered to be used, which may correlate with geography; (d) the stage of the growing

cycle at which an active ingredient may be used; and (e) the performance of an active ingredient under prevailing climate and weather conditions.

33.     Each AI has what is referred to as a "mode of action," which is the chemical and biological sequence of events that causes a crop protection product to kill or control the targeted pest.  While AIs that share a common mode of action tend to have similar use cases, there are often differences in performance and other reasons why one active ingredient cannot readily replace another for a given application or a given condition.  Farmers may prefer one AI over another for various reasons, including the specific performance characteristics of the active ingredient or a farmer's past success with an active ingredient.  As a result, a chemically equivalent generic crop-protection product is a closer substitute for a given branded product than is a product containing a different AI.

34.     The U.S. market value for all crop protection products was estimated to be $12.1 billion in 2019.  Herbicides accounted for about two-thirds of that amount, with sales estimated at $8.32 billion.  Insecticides had estimated sales of $1.7 billion, and fungicides at $1.95 billion.[1]

## B.     Regulatory Framework for Crop Protection Products

35.     When a company develops a new active ingredient for use in crop protection products, federal law entitles that company to protection from competition for that active ingredient for a limited period of time.  Two legal frameworks provide this protection.[2]

36.     First, a company that has developed a new active ingredient may apply for U.S. patent protection.  Under U.S. patent law, a company that successfully obtains a patent gains twenty years of exclusive use of that invention starting on the day that patent was issued.

37.     Second, the Federal Insecticide, Fungicide, and Rodenticide Act, also known as FIFRA, provides certain exclusivity protections for companies that develop a new active ingredient and obtain regulatory approval for that ingredient.  Specifically, a company seeking to sell a new

---

[1] *See The US Agrochemical Market: Channel Facing Pressure of Profitability and Consolidation, New Commercial Approach Emerges*, *available at* https://news.agropages.com/News/NewsDetail---36897.htm (last visited July 19, 2023).

[2] *See* Pesticide Laws and Regulations, http://npic.orst.edu/reg/laws.html (last visited July 19, 2023).

active ingredient must first obtain approval from the federal Environmental Protection Agency ("EPA"), to ensure that the crop protection product will not cause unreasonable harm to human health or the environment. In order to obtain such approval, the applicant must submit substantial scientific data to the EPA about the health and environmental effects of the product.

38. Once the EPA has approved the new active ingredient, the applicant gains exclusive rights to use the scientific data it provided to the agency for a period of ten years. This ten-year period functionally serves as a separate exclusivity period in which other companies cannot use the active ingredient. This ten-year period frequently ends after the date of patent expiration and, in practice, extends the length of time in which the company that developed the active ingredient possesses exclusive rights to sell it.

39. Both the patent system and the FIFRA approval system incentivize innovation. Companies that develop a new active ingredient are rewarded with a substantial period of time in which they may market crop protection products containing the active ingredient free of competition from rival companies.

40. At the same time, both of these legal frameworks are, by design, limited in time. Once the protections provided by patent law and FIFRA expire, federal law deliberately opens the market up to competition. At that point, a company that did not develop a given active ingredient may nevertheless manufacture and sell crop protection products containing that active ingredient. Such a company's products are still subject to the FIFRA regulatory approval process, but it may rely on the original developer's data to obtain regulatory approval (in some cases in exchange for payments to the original developer of the active ingredient).

41. The period of time after which the exclusivity rights provided under patent law and FIFRA have expired is commonly known as the "post-patent" period. Active ingredients that are no longer subject to those regimes are known as "post-patent" active ingredients.

**C.     Crop Protection Product Supply Chain**

42. Crop-protection product manufacturers create, market, and sell crop protection products. They may synthesize the active ingredients for their formulated products in their own facilities or purchase the active ingredients from other chemical manufacturers.

10

43.     A crop protection product manufacturer that researches, develops, and patents new active ingredients is known as a "basic" manufacturer. Syngenta and Corteva are basic manufacturers, and they are among the largest crop protection product manufacturers in the United States and globally.

44.     Generic manufacturers primarily sell crop protection products containing active ingredients initially developed by others and as to which patent and regulatory exclusive-use periods have expired (sometimes called "post-patent" active ingredients). More than a dozen generic manufacturers sell crop protection products in the United States.

45.     Generic manufacturers are capable of producing crop protection products that are equivalent to the crop protection products sold by basic manufacturers like Syngenta and Corteva. As one owner of an independent dealer of crop protection products put it, generics "are the same products as the name brand."

46.     Within the crop protection products market, manufacturers usually sell directly to distributors. The seven largest distributors include: Helena Agri-Enterprises; Nutrien Ag Solutions; Growmark; WinField Solutions; J.R. Simplot Company; Wilbur-Ellis; and CHS Inc.

47.     Distributors usually sell directly to retailers. There are many more retailers than there are distributors. Some retailers are integrated with distributors. Retailers are typically located near to the farmers who purchase directly from them.

48.     This chain of sales—from manufacturers to distributors to retailers—is known in the crop protection product industry as the "traditional distribution channel." More than 90% of sales of crop protection products runs through the traditional distribution channel, and more than 90% of sales through the traditional distribution channel run through the seven largest distributors. In consequence, more than 80% of sales of crop protection products run through the seven largest distributors.

49.     It would be inefficient for manufacturers to bypass distributors and sell directly to retailers or farmers. Distributors typically have access to a large preexisting base of customers, while manufacturers do not. Distributors also have access to warehouses, transportation, and other key logistical resources that manufacturers typically do not possess. Manufacturers do not usually

11

have expertise or experience in widely distributing their products to retailers or farmers. For those reasons, as one former employer for Corteva put it, manufacturers do not sell crop protection products directly to growers.

50. In short, there are no viable, cost-effective alternatives to selling through the traditional distribution channel.

**D. Defendants' Loyalty Programs**

51. When the market is operating without interference, generic crop protection products are typically priced substantially lower than their branded counterparts. When a generic manufacturer obtains market access through a traditional channel, its entry into the market initiates price competition. Both price and sales volume for the branded products then adjust downward.

52. Syngenta and Corteva, both basic manufacturers, have each benefited from long-lasting exclusivity rights as a result of the regulatory framework. But, unwilling to relinquish the pricing and market-share benefits of exclusivity after exclusivity rights expire, each Defendant implemented loyalty programs through agreements with distributors, which collectively make up the majority of all sales of crop protection products in the United States. Each Defendant designs and administers its loyalty program with the purpose, intent, and expectation that the program will be sufficiently widespread so as to impede generic competition for that Defendant's products, and thereby maintain market prices and branded market share at levels higher than would otherwise prevail in a competitive market. Each does so for its own benefit and for the benefit of its distributor partners.

53. Each Defendant's loyalty program is designed to retain market share while pricing its crop protection products above competitive levels. Each Defendant has substantially succeeded in impeding generic competition for its active ingredients.

54. Syngenta operates its loyalty program—called the "Key AI" program—with both distributors and retailers. It is implemented through written marketing agreements with participating distributors.

55. Like Syngenta's loyalty program, Corteva's loyalty program conditions payments to distributors on meeting certain loyalty thresholds for specified active ingredients. Upon

information and belief, Corteva's loyalty programs are also implemented through written marketing agreements with participating distributors.

56.     Through their respective loyalty programs, Defendants incentivize distributors to refuse to sell generic manufacturers' crop protection products.  This enables Defendants to increase market prices and maintain or increase their shares of crop protection products used by farmers.

57.     Defendants' loyalty programs are specifically designed to maintain supracompetitive prices and profits, which the Defendant manufacturers then share with their distributors and retail partners all at the expense of farmers.  The agreements require participating distributors and retailers to meet very high loyalty thresholds for each active ingredient and deter them from marketing and selling significant volumes of competing, lower-priced generic products. Through these agreements, each Defendant and its loyalty program participants restrict the access of generic manufacturers to traditional distribution channels, thereby protecting Defendants' monopoly power and achieving supracompetitive prices for all program participants.

58.     Several features of the loyalty programs ensure their success.  Each Defendant enters loyalty-program agreements with substantially all leading distributors.  This fact is broadly known by all participants in the industry.  Since so many leading distributors participate, distributors are confident that no significant competing distributor will partner with a low-priced generic manufacturer and undercut them.

59.     Defendants also maintain their so-called "rebates" (in reality, exclusion payments meant to impede generic sales) at levels that ensure distributors will profit more from selling Defendants' branded products than they would from selling generic products, even at high volumes.

60.     Additionally, Defendants strictly enforce the terms of their loyalty programs and penalize distributors who do not meet loyalty thresholds.  In some instances, the consequences of missing a loyalty threshold can be so severe that distributors have declined to purchase or promote generic products at all, have endeavored to exceed loyalty thresholds, and have deferred purchases of generic products until the end of the season, in order to minimize the risk of inadvertently missing a loyalty threshold.

CLASS ACTION COMPLAINT

61.   Recognizing that Defendants' loyalty programs effectively block generic manufacturers' access to the crop protection product market, generic manufacturers have avoided investing resources necessary to manufacture products with active ingredients developed by Defendants even after the patent exclusivity period for these active ingredients expired.  As a result, Defendants have maintained monopolies in the market for key active ingredients used in crop protection products widely relied on by farmers.

**E.   Relevant Products and Markets**

62.   Defendants have successfully achieved their goals of retaining their market shares while pricing their crop protection products at supracompetitive levels.

*i.   Syngenta's Products and Program*

63.   Syngenta's loyalty program applies to at least three active ingredients that are threatened by generic competition: azoxystrobin, mesotrione, and metolachlor.

- ***Azoxystrobin***. Azoxystrobin is a fungicide used to protect a wide variety of crops from fungal diseases.  Upon information and belief, it has annual global sales of over $1 billion.  Sales of products containing azoxystrobin in the United States totaled in the millions in 2020 alone.  Azoxystrobin was initially developed, patented, and registered with the EPA by a Syngenta predecessor company.  Upon information and belief, Syngenta's exclusive-use period under FIFRA and its relevant patent protection has expired.  According to the FTC, "[a]t least one other generic manufacturer decided against introducing an azoxystrobin product because of the lack of market access due to Syngenta's loyalty program."[3]

- ***Mesotrione***. Mesotrione is a widely used corn herbicide. Sales of products containing mesotrione in the United States totaled in the millions in 2020. Mesotrione was initially developed, patented, and registered with the EPA by Syngenta (including Syngenta affiliates).  Syngenta's relevant exclusive-use period under the FIFRA and patent protection has expired.  According to the FTC, at least "two generic manufacturers delayed or terminated their planned mesotrione entry due to loyalty-program concerns."[4]

- ***Metolachlor***. Metolachlor (which refers to the original active ingredient and the later-registered s-metolachlor variant) is an herbicide used on a wide variety of crops, including corn, soybeans, grain sorghum, cotton, potatoes

[3] Complaint, *Federal Trade Commission, et al. v. Syngenta Crop Protection AG*, M.D.N.C. 1:22-cv-00828 (Sept. 29, 2022), ¶ 90.

[4] *Id*. at ¶ 99.

14
CLASS ACTION COMPLAINT

and many others. Sales of products containing metolachlor in the United States totaled in the millions in 2020. The original metolachlor compound was developed, patented, and registered with the EPA by a Syngenta predecessor company in or about 1976, and Syngenta's relevant patent protection for that compound expired in or about 1996. A Syngenta predecessor company also developed, patented, and registered a variant of the original metolachlor, known as s-metolachlor. Syngenta's relevant patent protection and the FIFRA exclusive-use period for s-metolachlor has expired. According to the FTC, "[g]eneric manufacturers introduced products containing original metolachlor in or about 2003, [but] were unable to achieve significant market success. Other generic manufacturers delayed or canceled introduction of metolachlor products as a result of Syngenta's loyalty program." Subsequent generic manufacturers of products containing s-metolachlor have also been marginalized by Syngenta's loyalty program.[5]

64. Under its loyalty programs, Syngenta has made payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic azoxystrobin, mesotrione, and metolachlor products.

65. Syngenta's loyalty program has substantially impeded generic manufacturers from providing effective competition in the sale of azoxystrobin, mesotrione, and metolachlor products.

66. To meet the threshold required under Syngenta's loyalty program, distributors strictly manage and allocate their generic azoxystrobin, mesotrione, and metolachlor open space under the loyalty program and steer their customers toward loyalty-compliant azoxystrobin, mesotrione, and metolachlor products. The loyalty programs prevent distributors from purchasing available, sufficient supplies of generic products despite the fact that customer demand for lower-priced generic products exceeds the available open space.

67. As a result, Syngenta's prices remain significantly above competitive levels. Syngenta's loyalty program has resulted in higher prices for crop protection products containing azoxystrobin, mesotrione, and metolachlor than would prevail in a competitive market.

*ii.* ***Corteva's Products and Program***

68. Corteva's loyalty program applies to at least three active ingredients: rimsulfuron, oxamyl, and acetochlor.

- ***Rimsulfuron.*** Rimsulfuron is an herbicide used on crops such as fruit, tree nuts, potatoes, corn, soybeans, peanuts, and tomatoes. Sales of products

---
[5] *Id.* at ¶ 111.

containing rimsulfuron in the United States totaled in the millions in 2020. Rimsulfuron was originally developed, patented, and registered with the EPA by a Corteva predecessor company (DuPont). Corteva's relevant patent protection has expired for rimsulfuron and the exclusive-use period under FIFRA expired by 2007, ten years prior to the 2017 Dow-DuPont merger that led to the formation of Corteva.

- ***Oxamyl.*** Oxamyl is an insecticide and nematicide used primarily on cotton and potatoes, as well as apples, citrus fruits and many other fruit and vegetable crops. Sales of products containing oxamyl in the United States totaled in the millions in 2020. Oxamyl was initially developed, patented, and registered with the EPA by a Corteva predecessor company (DuPont). Corteva's relevant patent protection for oxamyl has expired and the exclusive-use period under FIFRA expired no later than 1987. A Corteva plant outage between 2015 and 2017 interrupted the supply of oxamyl products from Corteva. In response to the outage, the first generic oxamyl manufacturer entered the market in or about the fall of 2017. Other generic manufacturers followed in or about 2018. Generic entrants were at first relatively successful, but after Corteva placed oxamyl in its loyalty program, distributors curtailed their purchases of generic oxamyl.

- ***Acetochlor.*** Acetochlor is an herbicide that is used predominantly on corn, but also is used on ***cotton***, soybeans, sunflowers, peanuts, potatoes, and sugarcane. Sales of products containing acetochlor in the United States totaled in the millions in 2020. The EPA granted registration for acetochlor in 1994 to the Acetochlor Registration Partnership ("ARP"), a joint venture of basic manufacturers. The ARP continues to hold the U.S. registration for acetochlor; its current partners are Corteva and Bayer. Bayer manufactures acetochlor for both parties. The patent exclusivity period for acetochlor expired, as well as the exclusive-use period under FIFRA. Since the first generic acetochlor sales in or about 2018, generic manufacturers have made little headway with distributors.

69. Under its loyalty programs, Corteva has made payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic rimsulfuron, oxamyl, and acetochlor products.

70. Corteva's loyalty program has substantially impeded generic manufacturers from providing effective competition in the sale of rimsulfuron, oxamyl, and acetochlor products.

71. To meet the terms of Corteva's loyalty program, distributors strictly manage and allocate their generic rimsulfuron, oxamyl, and acetochlor open space under the loyalty program and steer their customers toward loyalty-compliant rimsulfuron, oxamyl, and acetochlor products. For example, some distributors have removed generic products containing rimsulfuron from their

product lists completely. Loyalty-program constraints have also caused distributors to refrain from purchasing more than minimal amounts of generic oxamyl (or in some cases, any at all) and loyalty-program constraints have prevented distributors from purchasing more than minimal amounts of generic acetochlor (or in some cases, any at all) despite generic products being of sufficient quality and supply availability.

72. As a result, Corteva's prices remain significantly above competitive levels. Corteva's loyalty program has resulted in higher prices for products containing rimsulfuron, oxamyl, and acetochlor than would prevail in a competitive market.

73. The relevant Syngenta and Corteva products described above are referred to herein as "Relevant AIs."

**F. Defendants' Monopoly Power**

74. At all times during the Relevant Period, Syngenta has had monopoly and market power with respect to azoxystrobin, mesotrione, metolachlor, and with respect to crop protection products containing those Relevant AIs.

75. At all times during the Relevant Period, Corteva has had monopoly and market power with respect to rimsulfuron, oxamyl, and acetochlor and with respect to products containing those Relevant AIs.

76. Evidence of each Defendant's monopoly and market power includes each Defendant's ability to price Relevant AIs and products containing those Relevant AIs above competitive levels, and to exclude competition from generic manufacturers through operation of its loyalty program. Each Defendant's monopoly and market power is also shown through dominant or substantial market shares in relevant markets with substantial barriers to entry.

77. Each relevant market is defined by reference to a Relevant AI. For each of azoxystrobin, mesotrione, metolachlor, rimsulfuron, oxamyl, and acetochlor:

(a) A relevant product market exists that is no broader than the active ingredient, consisting of: (1) the active ingredient included as a component of an EPA-registered finished product for sale in the United States, and (2) technical-grade or manufacturing-use active ingredient to be formulated into an EPA-

17

registered product for sale in the United States; and

(b)    A relevant product market(s) also exists that is no broader than EPA-registered products for sale in the United States that contain the active ingredient.

These markets are referred to herein as the "Relevant Markets."

78.    For each Relevant AI, absent the restraint imposed by Defendants' loyalty programs, unrestrained competition from generic manufacturers would have a significant and non-transitory downward effect on prices in the Relevant Markets.

79.    Each Relevant AI has particular characteristics and uses that differentiate it from other active ingredients.

- *Azoxystrobin*. Azoxystrobin can be used across all major row crops, which simplifies pesticide management. Syngenta also claims that *azoxystrobin* has growth-enhancing effects not proven in other active ingredients.

- *Mesotrione*. Compared to other, similar herbicide active ingredients, mesotrione has superior efficacy and crop safety, and a low use rate.

- *Metolachlor*. Compared to other, similar herbicide active ingredients, metolachlor has superior water solubility, and therefore tends to perform better in dry conditions. Metolachlor also outperforms other active ingredients in warmer conditions, is more "crop friendly," and can be used on a broader spectrum of crops.

- *Rimsulfuron*. Compared to other, similar herbicide active ingredients, rimsulfuron can be used on a broader range of crops, controls a wider spectrum of weeds, can be used both pre- and post-emergence, and has more application methods, no dormancy restrictions, and a lower use rate. Further, rimsulfuron is inexpensive to produce compared to other, similar herbicide active ingredients.

- *Oxamyl*. Oxamyl products can be sprayed directly onto crops, whereas other, similar insecticide active ingredients must be applied at the root level or mixed into the soil. Oxamyl is also safer for crops and better for soil health than other, similar insecticide active ingredients.

- *Acetochlor*. Compared to other similar, herbicide active ingredients, acetochlor tends to perform better in wetter and cooler conditions. Acetochlor also tends to have better weed control early in the growing season and is more effective against certain weed species.

18
CLASS ACTION COMPLAINT

80.     Given these idiosyncratic characteristics, for each Relevant AI, other active ingredients are not substitutable to prevent Syngenta or Corteva from maintaining prices of products containing the Relevant AI above competitive levels.

81.     The relevant geographic market as to all products is the United States.  Crop protection products are largely sold and regulated on a nationwide basis.  Because the EPA must approve and register all crop protection products prior to sale or distribution in the United States, United States farmers may not lawfully use crop protection products manufactured and labeled for use outside of the United States.

82.     There are substantial barriers to entry into each Relevant Market.  Potential generic manufacturers face significant capital, technical, regulatory, and legal barriers, including obtaining registration from the EPA, developing manufacturing processes and sourcing the active ingredient, and paying data compensation costs to the basic manufacturer.

83.     Syngenta's and Corteva's loyalty programs also impose a substantial barrier to entry by limiting generic manufacturers' access to the traditional distribution channel, among other things.

84.     Upon information and belief, Syngenta has maintained dominant shares of the U.S. Relevant Markets for azoxystrobin, mesotrione, and metolachlor throughout the Class Period.

85.     Upon information and belief, Corteva has maintained dominant shares of the U.S. Relevant Markets for rimsulfuron and oxamyl throughout the Class Period.

86.     Upon information and belief, Corteva has maintained a substantial share of the U.S. Relevant Market for acetochlor throughout the Class Period.  Upon information and belief, Bayer imposes limited constraints on Corteva's pricing of acetochlor products compared to generic manufacturers, and Bayer's presence in the market has not prevented Corteva from maintaining prices of crop protection products containing acetochlor above competitive levels.

87.     For each Relevant AI, absent the restraints imposed by Syngenta's or Corteva's loyalty program, generic product manufacturers would have been able to effectively compete with Defendants and prices would have been lower.

CLASS ACTION COMPLAINT

## G. Harm to Competition and Consumers

88. Each Defendant's loyalty programs and other anticompetitive conduct in conjunction with the loyalty programs has harmed competition by substantially foreclosing generic competition in the Relevant Markets, thereby lessening competition, raising prices, reducing innovation, lessening choice, causing generic competitors to exit or abandon plans to enter the Relevant Markets, and/or tending to create or maintain monopolies in the Relevant Markets. Defendants' loyalty programs have also harmed consumers—farmers—by causing higher prices, reduced innovation, and reduced choice for farmers purchasing products in the Relevant Markets.

89. Each Defendant's anticompetitive conduct is not reasonably necessary to achieve any cognizable procompetitive benefits. The anticompetitive harm from their conduct outweighs any procompetitive benefits, and each Defendant could reasonably achieve any procompetitive goals through less restrictive alternatives.

90. Each Defendant's unlawful conduct is ongoing. Upon information and belief, each Defendant continues to operate its loyalty program, including by enforcing loyalty thresholds and making payments to distributors and retailers for meeting these thresholds and thus excluding generic competition. Absent injunctive relief ordered by this Court, each Defendant is likely to continue to harm competition and the public interest.

## H. Foreclosure of Competition

91. Defendants have harmed competition by foreclosing actual or potential competitors from access to distribution services, or by foreclosing actual or potential competitors from access to efficient distribution channels.

92. The most efficient channel of distribution for each Relevant Market is the traditional distribution channel. Each Defendant's loyalty program has almost entirely foreclosed generic manufacturers from access to the traditional distribution channel. With respect to each Relevant Market, this exclusion of generic competitors from the traditional channel has harmed the effectiveness of generic competitors by severely limiting their ability to achieve efficient, cost-effective distribution, and in some circumstances any distribution.

20

93. By excluding generic competitors from the traditional distribution channel, each Defendant's loyalty program has foreclosed a substantial share of each applicable Relevant Market to generic competition. This is because a high percentage of all crop protection product sales are made through the traditional channel (over 90%) and more than 90% of sales through the traditional channel run through the seven largest distributors. Thus, more than 80% of sales of crop protection products run through the seven largest distributors. Each Defendant's loyalty programs have effectively foreclosed generic competitors from competing for a substantial portion of each applicable Relevant Market.

94. The market foreclosure created by Defendants' loyalty programs has been of substantial duration. Generic manufacturers of products containing the applicable Relevant AIs have been substantially foreclosed from the Relevant Markets since at least 2017.

95. Defendants' loyalty programs have further foreclosed competition by offering and providing payments to distributors even when distributors do not agree or otherwise commit, in advance, to meet the relevant targets that Defendants include in their loyalty programs. The prospect of receiving a payment from Defendants—as well as profits from the higher prices caused by the market-wide exclusion of generics—has effectively induced distributors to limit or forgo purchases from lower-priced competitors that offer or would offer generic products containing the Relevant AIs.

96. Distributors adhere to Defendants' loyalty-program thresholds in significant part due to the prospect of receiving substantial payments under the programs. In addition, structural features of each Defendant's loyalty program promote adherence, as well as strict enforcement efforts.

97. Distributors' incentive to comply with loyalty-program thresholds is further enhanced by the fact that substantially all major distributors participate in the programs. The loyalty programs benefit both Defendants and distributors because distributors profit more when prices to retailers and farmers are higher. The participation of all or substantially all distributors gives participating distributors increased confidence that no significant competing distributor will break ranks and lower the prices they all enjoy because of the scheme. Distributors thus benefit

21

from the arrangement because of, and so long as, their principal competing distributors participate as well, thereby ensuring that no distributor can take substantial market share away from other distributors by offering generic alternatives at cheaper prices.

98.     Together with Defendants' strict enforcement efforts, these features of Defendants' loyalty programs incentivize distributors to meet applicable loyalty thresholds by forgoing or severely limiting purchases from generic manufacturers.

99.     Upon information and belief, Defendants also discourage distributors from passing on payments made pursuant to loyalty programs to farmers. This has the effect of maintaining artificially high prices for crop protection products manufactured by Defendants in the Relevant Markets.

100.     The loyalty-program complexity, lack of transparency to farmers and generic manufacturers harmed by the conduct, and deferred payment timing cause distributors to retain loyalty program payments as profit and make them less likely to pass on loyalty program payments to farmers in the form of lower prices. The terms of loyalty programs are confidential and are not accessible by farmers or manufacturers of generic products.

101.     As a result of Syngenta's and Corteva's respective loyalty programs, distributors have severely limited their purchase, promotion, and sale of generic products containing each Relevant AI. To meet applicable loyalty thresholds, distributors have omitted generic products from their product lists, refused customer requests for generics, declined generic companies' offers to sell crop protection products, and steered retailers and farmers toward branded products.

102.     As a result of Syngenta's and Corteva's respective loyalty programs, distributors have declined to buy more than minimal amounts of products containing each applicable Relevant AI from generic manufacturers despite sufficient demand, availability and quality of generic products.

103.     With respect to each Relevant AI, in the absence of the applicable Syngenta or Corteva loyalty program, generic manufacturers would make significantly more sales to distributors, which would enable them to realize distribution efficiencies and scale benefits. These

CLASS ACTION COMPLAINT

benefits would increase price competition, innovation, and choice in Relevant Markets, which in turn would benefit American farmers.

104. In the absence of Defendants' respective loyalty programs, sales of generic products containing Relevant AIs would be significantly higher and would exceed the limits dictated by the loyalty programs. American farmers would benefit from having an increased amount of lower-price generic products available in Relevant Markets.

105. In contrast to the Relevant AIs, when selling products containing active ingredients that are not subject to the loyalty programs, generic manufacturers are able to make all or nearly all of their sales through traditional distribution channels.

106. In the applicable Relevant Markets (azoxystrobin, mesotrione, and metolachlor), Syngenta has added an additional layer of foreclosure to that created by its distributor loyalty program through its retail loyalty program. As with the distributor program, the retail program has substantially foreclosed generic manufacturers from efficient distribution of their products, given the participation of leading retailers in the program.

107. Each Defendant's loyalty program has prevented, delayed, and diminished entry and expansion by generic manufacturers of products containing applicable Relevant AIs, and caused generic manufacturers to exit the market for products containing Relevant AIs, even when generic manufacturers can otherwise satisfy regulatory conditions and overcome other barriers to entry.

108. Multiple generic manufacturers have concluded that entry into the market is not economically feasible due to the artificial constraints created by applicable Syngenta or Corteva loyalty programs.

109. In some cases, Syngenta's or Corteva's loyalty program has caused foreclosure of sales opportunities that have led a generic manufacturer already competing in a Relevant Market not to re-register its product, or to stop offering a product containing the Relevant AI.

110. In the absence of Defendants' respective loyalty programs, generic manufacturers would compete more effectively and compete for more sales in each Relevant Market.

111.    Each Defendant's so-called "loyalty program" has reduced the ability and incentive of generic manufacturers to bring new differentiated crop protection products containing applicable Relevant AIs to market, harming innovation and restricting farmer choice.

112.    Generic manufacturers often create new active-ingredient mixtures or other new offerings that meet farmer needs. Generic manufacturers also often innovate on the non-active-ingredient components in ways that are beneficial to farmers.

113.    Because of the barriers to entry created by Syngenta's and Corteva's respective loyalty programs, generic manufacturers have in several instances abandoned attempts to develop innovative products containing applicable Relevant AIs. For the same reason, when determining whether to bring to market an innovative product, such as a new mixture, generic manufacturers have sought to avoid using active ingredients that are subject to either Defendant's loyalty program.

114.    In the absence of Defendants' respective loyalty programs, there would be more innovative products from generic manufacturers in the applicable Relevant Markets, leading to more farmer choice.

115.    Each Defendant's so-called "loyalty program" has resulted in higher prices to farmers for crop protection products containing Relevant AIs than would prevail in competitive markets. Each Defendant's anticompetitive conduct has thwarted the downward pressure that generic manufacturers' entry and expansion with access to efficient distribution would otherwise impose on prices in markets for products containing Relevant AIs.

116.    Generic crop protection products are generally priced lower than branded equivalents, and as to each Relevant AI, farmers pay more for products containing the active ingredient because the applicable loyalty program artificially limits the availability of lower-priced generic alternatives. In many cases, farmers buy the more expensive, branded product because that is what is available and/or what is promoted by the traditional distribution channel, and not because that is what they prefer. Defendants' loyalty programs thus result in unmet and unrealized demand for lower-priced equivalent generic products.

117.    When generic manufacturers are able to access the market for an active ingredient, they put downward pressure on the prices of branded products containing that active ingredient,

and the more pressure they exert the more access they achieve. This downward pressure affects not only lower-end brands for which generics have exact substitutes upon entry, but all products containing the active ingredient, including higher-end mixture products. Defendants' loyalty programs, however, inhibit generic manufacturers' ability to access relevant markets and thus limit downward pricing pressure from generic competition.

118. Even where generic manufacturers enter and sell at low prices to distributors, Defendants' loyalty programs result in higher prices to farmers by limiting the amount of available generic product. This in turn enables distributors or retailers to price generic products just under branded products and to maintain branded prices, thus preventing the full benefits of generic price competition from flowing to farmers.

119. In countries where loyalty programs for crop protection products do not exist, generic manufacturers have been able to compete more effectively and farmers pay correspondingly lower prices.

120. Even where generic manufacturers have been able over time to enter a given Relevant Market and have provided some measure of price competition, Defendants' loyalty programs have limited the effects of this competition. Defendants' respective price responses, and responses of prices more generally in the applicable Relevant Market, have been less significant, and slower, than they would have been absent operation of the applicable loyalty program.

## V.   CLASS ACTION ALLEGATIONS

121. Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of members of the following Class:

> All persons or entities in Repealer States who, other than for the purpose of resale, indirectly purchased or paid for a crop protection product containing one or more of the Relevant AIs that was manufactured by one or more of the Defendants at any time during the period from January 1, 2017 through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

122.    A Repealer State is a state or district that has repealed the bar on indirect purchasers' right to recover damages under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and includes the following: Arkansas, Arizona, California, Connecticut, District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

123.    The following are specifically excluded from the Class: Defendants; officers, directors, and employees of Defendants; any entity in which Defendants have a controlling interest; any divisions, subsidiaries, and predecessors of Defendants; and any affiliate, legal representative, heir, or assign of Defendants.  Also excluded from the Class are: any federal, state, or local governmental entity; any judicial officer presiding over this action and the members of their immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified during the course of this action.

124.    Members of the Class are so numerous and geographically dispersed that joinder is impracticable.  Further, members of the Class are readily identifiable from information and records in the possession of Defendants and their respective distributors.

125.    Plaintiffs' claims are typical of the claims of the members of each of the Class. Plaintiffs and members of the Class were injured by the same wrongful conduct of Defendants.

126.    Plaintiffs will fairly and adequately protect and represent the interests of members of the Class.  Plaintiffs' interests are coincident with, and not antagonistic to, those of members of the Class.

127.    Plaintiffs are represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation.

128.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Class as a whole appropriate.  Questions of law and fact common to members of each Class include, but are not limited to:

    a.    Whether each of the Defendants entered into exclusionary agreements with their respective distributors to unreasonably restrain trade in violation of federal antitrust law;

    b.    Whether each of the Defendants entered into exclusionary agreements with their respective distributors to unreasonably restrain trade in violation of state antitrust and unfair competition laws;

    c.    Whether each of the Defendants intentionally or unlawfully impaired or impeded competition in the Relevant Markets;

    d.    Whether each of the Defendants has monopoly and/or market power in each of the Relevant Markets;

    e.    Whether each of the Defendants willfully maintained or enhanced their monopoly and/or market power in the Relevant Markets;

    f.    Damages suffered by Plaintiffs and members of the Class; and

    g.    Whether Defendants have acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

129.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

130.    The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

131.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

132.    Plaintiffs have defined members of each Class based on currently available information and hereby reserve the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## VI. EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

133. Any applicable statute of limitations for Plaintiffs and the Class has been tolled with respect to any claims and rights of action that Plaintiffs and the Class have as a result of the unlawful combination and conspiracy alleged in this Complaint. Defendants are equitably estopped from asserting a statute of limitations defense by reason of Defendants' concealment of the conspiracy.

134. Plaintiffs and the Class were not placed on actual or constructive notice of the conspiracy alleged herein until, at the earliest, the FTC filed its complaint on September 29, 2022. Specifically, the FTC's complaint set forth the findings of its ongoing investigation into Defendants and made public allegations that Defendants' loyalty programs restrained competition and caused higher prices, among other harms. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the Class.

135. Defendants maintain and enforce strict confidentiality provisions in agreements with distributors that describe loyalty programs. Distributors' contracts also contain strict confidentiality provisions, prohibiting the disclosures of prices retailers pay to wholesalers for crop protection products.

136. Accordingly, Plaintiffs and the Class have virtually no visibility into Defendants' loyalty programs, let alone a conspiracy to use the loyalty programs to restrain trade and maintain supracompetitive prices.

## VII. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### 15 U.S.C. § 1
### (FOR DECLARATORY AND EQUITABLE RELIEF)

137. Plaintiffs incorporate and reallege, as though fully set forth therein, each and every allegation set forth in the preceding paragraphs of this Complaint.

138. During the Class Period, Defendants each entered into loyalty agreements with distributors that provided for exclusionary payments designed to block generic competitors from competing in the Relevant Markets and keep prices for their crop protection products artificially high.

28

139.     In formulating and carrying out the alleged agreement, understanding, and conspiracy, each Defendant and its loyalty program participating distributors did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others: engaged in a combination or conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for products containing the Relevant AIs principally but not exclusively, by designing and enforcing loyalty programs that prevented and continue to prevent competing generic manufacturers from entering the market and/or efficiently distributing their products.

140.     This conspiracy is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

141.     Alternatively, this conspiracy is a violation of Section 1 of the Sherman Act under the "quick look" or rule of reason mode of analysis. There is no legitimate business justification for, or pro-competitive benefits attributable to, each Defendant's conspiracy and the overt acts in furtherance thereof. Any proffered business justification or asserted pro-competitive benefits would be pre-textual, outweighed by the anticompetitive effects of Defendants' conduct, and in any event, could be achieved by means less restrictive than the conspiracy and overt acts alleged herein.

142.     Plaintiffs and members of the Class indirectly purchased crop protection products containing the Relevant AIs from Defendants at supracompetitive prices, suffering antitrust injury as a material, direct, and proximate result of Defendants' conspiracy and overt acts in furtherance thereof.

143.     Plaintiffs and members of each Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

144.     Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Act, 15 U.S.C. § 26.

145.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a), Plaintiffs and the Class seek a declaratory judgment that Defendants' anticompetitive conduct as described in the preceding paragraphs violates section 1 of the Sherman Act.

146.    Plaintiffs and the Class seek and are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT
## 15 U.S.C. § 2
## (FOR DECLARATORY AND EQUITABLE RELIEF)

147.    Plaintiffs incorporate and reallege, as though fully set forth therein, each and every allegation set forth in the preceding paragraphs of this Complaint.

148.    At all times relevant to assessing its conduct, Syngenta has had monopoly power in Relevant Markets for azoxystrobin, metolachlor, and mesotrione.  At all times relevant to assessing its conduct, Corteva has had monopoly power in Relevant Markets for rimsulfuron, oxamyl, and acetochlor.

149.    Each Defendant has maintained its monopoly power through a course of anticompetitive and exclusionary conduct—primarily, but not exclusively, by entering and maintaining agreements with distributors and retailers that contain loyalty requirements and enforcing and threatening enforcement of loyalty requirements or otherwise threatening penalties—in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

150.    As a direct and proximate result of Defendants' violation of section 2 of the Sherman Act, Plaintiffs and members of the Class have been injured in their businesses and property in the form of overcharges, and Plaintiffs and members of the Class will continue to suffer such injures if Syngenta and Corteva do not cease their anticompetitive conduct. These injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Syngenta's and Corteva's conduct unlawful.

151.    Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of section 2 of the Sherman Act within the meaning of section 16 of the Clayton Act, 15 U.S.C. § 26.

152.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a), Plaintiffs and the Class seek a declaratory judgment that Defendants' anticompetitive conduct as described in the preceding paragraphs violates section 2 of the Sherman Act.

153.    Plaintiffs and the Class seek and are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF SECTION 3 OF THE CLAYTON ACT**
**15 U.S.C. § 14**
**(FOR DECLARATORY AND EQUITABLE RELIEF)**

154.    Plaintiffs incorporate and reallege, as though fully set forth therein, each and every allegation set forth in the preceding paragraphs of this Complaint.

155.    Defendants have provided exclusionary payments to distributors and retailers, in the form of rebates for the sale of crop protection products, that are conditioned on the recipients not using or dealing in the goods of generic manufacturers of crop protection products in accordance with "loyalty" terms.

156.    Defendants' anticompetitive and exclusionary conduct has substantially lessened competition and tends to create monopolies in each of the Relevant Markets.

157.    Defendants' exclusionary conduct has foreclosed a substantial share of the Relevant Markets to competition from generic manufacturers.

158.    Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of section 3 of the Clayton Act within the meaning of section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

159.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a), Plaintiffs and the Class seek a declaratory judgment that Defendants' anticompetitive conduct as described in the preceding paragraphs violates section 3 of the Clayton Act.

160.    Plaintiffs and the Class seek and are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## FOURTH CLAIM FOR RELIEF
## VIOLATIONS OF STATE ANTITRUST LAWS

161.    Plaintiffs incorporate and reallege, as though fully set forth therein, each and every allegation set forth in the preceding paragraphs of this Complaint.

162.    During the Class Period, Defendants and their respective distributors entered into a continuing agreement, understanding, and conspiracy, in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for products containing the Relevant AIs in the United States, and/or have maintained their monopoly power through a course of anticompetitive and exclusionary conduct.

163.    Defendants' conduct has caused unreasonable restraints in the Relevant Markets.

164.    As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been harmed by, among other things, paying inflated prices for crop protection products containing the Relevant AIs in the United States and in each of the Repealer States below.

165.    By engaging in the aforementioned conduct Defendants intentionally and wrongfully violated the following state antitrust laws:

a.    Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona by Class members;

b.    California Cartwright Act, Cal. Bus. Code §§ 16700, *et seq.*, with respect to purchases in California by Class members;

c.    Connecticut Antitrust Act, Conn. Gen. Stat. § 35-24, *et seq.*, with respect to purchases in Connecticut by Class members;

d.    District of Columbia Antitrust Act, DC. Code §§ 28-4501, *et seq.*, with respect to purchases in District of Columbia by Class members;

e.    Hawaii Antitrust Act, Hawaii Code § 480-4, *et seq.*, with respect to purchases in Hawaii by Class members;

f.    Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/3, *et seq.*, with respect to purchases in Illinois by Class members;

g.    Iowa Competition Law, Iowa Code §§ 553.1 *et seq.*, with respect to purchases in Iowa by Class members;

h.    Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by Class members;

i.    Maine Antitrust Statute, Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in Maine by Class members;

32

j.    Maryland Antitrust Statute, Md. Code, Com. Law § 11-204, *et seq.*, with respect to purchases in Maryland by Class members;

k.    Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, with respect to purchases in Michigan by Class members;

l.    Minnesota Antitrust Law, Minn. Stat. §§ 325D.49-66, with respect to purchases in Minnesota by Class members;

m.   Mississippi Antitrust Statute, Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases in Mississippi by Class members;

n.    The Nebraska Junkin Act, Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska by Class members;

o.    Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §§ 598A.010, *et seq.*, with respect to purchases in Nevada by Class members;

p.    New Hampshire Antitrust Statute, N.M. Stat. tit. XXXI, §§ 356, *et seq.*, with respect to purchases in New Hampshire by Class members;

q.    New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New Mexico by Class members;

r.    New York Donnelly Act, N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York by Class members;

s.    North Carolina Antitrust Statute, N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North Carolina by Class members;

t.    North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases in North Dakota by Class members;

u.    Oregon Antitrust Law, Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases in Oregon by Class members;

v.    Puerto Rico Antitrust Statute, P.R. Laws Ann. tit. 10 §§ 258, *et seq.*, with respect to purchases in Puerto Rico by Class members;

w.   Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq.*, with respect to purchases in Rhode Island by Class members;

x.    South Dakota Antitrust Statute, S.D. Codified Laws Ann. §§ 37-1, *et seq.*, with respect to purchases in South Dakota by Class members;

y.    Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by Class members;

z.    Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases in Utah by Class members;

aa.   West Virginia Antitrust Act, W. Va. Code §§ 47-18-1, *et seq.*, with respect to purchases in West Virginia by Class members; and

166.    Plaintiffs and the Class members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Defendants' anticompetitive conduct.

### FIFTH CLAIM FOR RELIEF
### VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

167.    Plaintiffs incorporate and reallege, as though fully set forth therein, each and every allegation set forth in the preceding paragraphs of this Complaint.

168.    During the Class Period, Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in the states pleaded below.

169.    As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiffs and the Class members have been harmed by, among other things, paying inflated prices for crop protection products containing the Relevant AIs in each of the Repealer States below.

170.    By engaging in the foregoing conduct, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of the following state unfair and deceptive trade practices and consumer protection statutes:

a.    Arkansas Deceptive Trade Practices Act, Ark. Code §§ 4-88-101, *et seq.*, with respect to purchases in Arkansas by Class members;

b.    California Unfair Competition Law, Cal. Bus. and Prof. Code §§ 17200, *et seq.*, with respect to purchases in California by Class members;

c.    District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et seq.*, with respect to purchases in the District of Columbia by Class members;

d.    Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by Class members;

e.    Hawaii Unfair or Deceptive Trade Practices Act, Hawaii Code § 480-2, *et seq.*, with respect to purchases in Hawaii by Class members;

f.    Idaho Consumer Protection Act, Idaho Code §§ 48-601, *et seq.,* with respect to purchases in Idaho by Class members;

g.    Massachusetts Consumer Protection Act, Mass. Gen. Laws, ch. 93A, § 1, *et seq.,* with respect to purchases in Massachusetts by Class members;

h.     Missouri Merchandising Practices Act, Mo. Stat. §§ 407.010, *et seq.*, with respect to purchases in Missouri by Class members;

i.     Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code §§ 30-14-103, *et seq.*

j.     Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq.*, with respect to purchases in Nebraska by Class members;

k.     Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.*, with respect to purchases in Nevada by Class members;

l.     New Hampshire Consumer Protection Act, N.H. Rev. Stat. tit. XXXI, §§ 358-A, *et seq.*, with respect to purchases in New Hampshire by Class members;

m.     New Mexico Unfair Practices Act, N.M. Stat. §§ 57-12-1, *et seq.*, with respect to purchases in New Mexico by Class members;

n.     North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.*, with respect to purchases in North Carolina by Class members;

o.     North Dakota Unfair Trade Practices Act, N.D. Cent. Code §§ 51-10, *et seq.*, with respect to purchases in North Dakota by Class members;

p.     Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-1, *et seq.*, with respect to purchases in Utah by Class members; and

q.     Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, § 2451, *et seq.*, with respect to purchases in Vermont by Class members.

171.     Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair, unconscionable, and/or deceptive conduct. Their injury consists of paying higher prices for products containing the Relevant AIs than they would have paid in the absence of these violations. This injury is of the type that state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct. On behalf of themselves and the Class, Plaintiffs seeks all appropriate relief provided for under the foregoing statutes.

**SIXTH CLAIM FOR RLIEF**
**UNJUST ENRICHMENT**

172.     Plaintiffs incorporate and reallege, as though fully set forth therein, each and every allegation set forth in the preceding paragraphs of this Complaint.

173. Defendants received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense. For example, Plaintiffs and Class members paid supracompetitive prices for crop protection products containing the Relevant AIs. Defendants' financial benefits resulting from their unlawful and inequitable conduct are economically traceable to overpayments for products containing the Relevant AIs.

174. Defendants unjustly retained those benefits at the expense of Plaintiffs and Class members because Defendants' conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and the Class.

175. The benefits that Defendants derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members. It would be inequitable under unjust enrichment principles for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

176. Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds they received, and such other relief as the Court may deem just and proper.

## VIII.  **PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully request judgment against Defendants as follows:

A. That the Court certify this lawsuit as a class action under Rules 23(a), 23(b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives, and that the Court direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B. That the unlawful conduct alleged herein be adjudged and decreed to violate Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 2, Section 3 of the Clayton Act, and the state antitrust, unfair competition, and consumer protection laws, as well as common law unjust enrichment for the states listed herein;

C. That Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming

36

to act on their behalf or in concert with them, be permanently enjoined and restrained from engaging in future anticompetitive conduct with the purpose or effect of foreclosing the Relevant Markets to competition from actual or potential rivals;

D.     That the Court award Plaintiffs and the Class actual, double, treble, and exemplary damages as permitted and as sustained by reason of the antitrust violations alleged herein, plus interest in accordance with the law;

E.     That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law;

F.     That the Court award Plaintiffs and the Class pre- and post-judgment interest as provided by law and that such interest be awarded at the maximum rate allowable by law from and after the date of service of this Complaint; and

G.     That the Court direct such other and further relief as the case may require and the Court may deem just and proper.

## IX.     **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated:  July 20, 2023                     Respectfully submitted,

                                          _/s/ Christopher T. Micheletti_
                                          Christopher T. Micheletti (SBN 136446)
                                          Qianwei Fu (SBN 242669)
                                          **ZELLE LLP**
                                          555 12th Street, Suite 1230
                                          Oakland, CA 94607
                                          Telephone:   (415) 693-0700
                                          Facsimile:   (415) 693-0770
                                          cmicheletti@zellelaw.com
                                          qfu@zellelaw.com

                                          *Counsel for Plaintiffs Robert Ott and*
                                          *Andrew Stanley*